No. 2243

Second Circuit Appeal

L. J. COCKRAFT v. VICKSBURG, SHREVEPORT AND PACIFIC RAILWAY CO.

(February 20, 1925, Opinion and Decree)

(*Syllabus by the Editor.*)

1. Louisiana Digest—Negligence—Par. 41; Railroads—Par. 80.
In a collision accident between an automobile and railroad train at a crossing the burden of proof is on the plaintiff to prove that the accident was caused by the fault of the defendant.

2. Louisiana Digest—Negligence—Par. 41, 42; Evidence—Par. 60.
The evidence of plaintiff's witnesses being insufficient to discharge the burden resting on him to prove that the accident was caused by the fault of the defendant, there must be judgment for the defendant.

Appeal from First Judicial District Court of Louisiana, Parish of Caddo. Hon. E. P. Mills, Judge.

REYNOLDS, J.

Action to recover $18,200.00 damages caused to defendant and his Dodge automobile in a collision between an engine of the Vicksburg, Shreveport and Pacific Railway Company and plaintiff and his automobile on the grade crossing on Market street, Shreveport, Louisiana, September 25, 1923.

Defendant denies liability on the ground that it was not guilty of any fault, and in the alternative pleaded that the negligence of plaintiff contributed to the accident and that his contributory negligence barred recovery.

There was judgment for defendant and plaintiff appealed.

Judgment affirmed.

Thigpen, Herold, Lee & Cousin, of Shreveport, attorneys for plaintiff, appellant.

Wise, Randolph, Rendall & Freyer, of Shreveport, attorneys for defendant, appellee.

STATEMENT.

Plaintiff drove or allowed his Dodge automobile to roll in front of defendant's incoming passenger train No. 1 and stopped when said train was only a short distance away.

As soon as the engineer in charge of the train knew or could have known of plaintiff's peril, he applied the emergency brakes and did all else in his power to stop his train.

Defendant attempted to back his automobile from the railway track but his engine was "dead" and a collision followed.

The question to be decided is: Was the defendant guilty of negligence; if so, was plaintiff guilty of such contributory negligence as to bar him from recovering damages.

OPINION.

The only negligence of plaintiff complained of by defendant is the negligence of the flagmen in charge of the grade crossing of the railway company over Market street in the city of Shreveport, Louisiana.

The evidence on this point is conflicting.

Plaintiff's evidence touching this question is as follows:

Page 5.
"Q. Just state what you did before attempting to cross at that point?
"A. I looked and everything seemed to be clear, and it was clear, and the flagman was out there with his flag in his right hand down as though everything was all right. He could see me clearly and I could see him and it was a kind of diagonal direction to him but he could see me without any trouble and I could see him without any trouble.

Page 7.
"Q. With reference to his stop sign, state to the court just the position he had it in.
"A. In his right hand to the side as though everything was all right. He saw me and I saw him and he stood there with the sign down by his side until I got right near the first track

when he suddenly shot it up excitedly, and I stopped immediately and cast my eye to the right and there was the approaching train right on this track just where the front end of my car was stopped, and I threw my car in reverse and released the brake and pressed on the gas hurriedly, and it seemed like death was on me and I was trying to get out of the way and I muckled my car—it didn't work. I lost hope of that saving me and I threw the door open to make my escape but as I got the door open and my foot on the outside and hadn't left the car the crash came, the locomotive hit the car and swung it around and turned it and finally it swung around and caught on the side of the engine and caught my limbs between the engine and the car.

Page 32.

"Q. You say you couldn't see any engine approaching to the right?

"A. Couldn't until I was right near the track.

"Q. How far from the track?

"A. Oh, just a few feet; you couldn't see around that building.

"Q. Well, how far?

"A. You see, I was on the right hand

"Q. Wait a minute. Answer my question; how far from the first track?

"A. I reckon ten or twelve feet.

Page 38.

"Q. Don't you know immediately after you passed the line of that brick house you could see clean down to the bridge?

"A. After you get past that you could.

"Q. And couldn't you have stopped your car between the time you passed the corner of that building if you had looked to the right and seen the train, couldn't you have stopped your car before you got on the rail?

"A. Well, I could have stopped about the first track.

"Q. Couldn't you have done it before you reached the rail?

"A. That would be hard to say. I couldn't exactly say. It takes about five or six feet to stop in, going even that slow. I was using all the precautions that a man could use.

Page 39.

"Q. Never mind about the flagman attending to his business now, that isn't what I asked you. I asked you if you had tried to help the situation by looking you could

have seen it. You wouldn't swear that you couldn't have stopped it, would you?

"Well, I would have been pretty close before I could have stopped."

The next witness is J. D. H. Smith, page 44:

"Q. Did you see him when he first raised his flag?

"A. I did.

"Q. Where was Mr. Cockraft when he first raised his flag?

"A. He was right near the crossing, very close, when he raised his flag—when he raisd his flag I immediately made an effort to stop, which I did, and Mr. Cockraft stopped too, about the first rail—the fact of the business is we both stopped very suddenly, but he stopped right on the crossing and the front part of his car looked as though it was on the crossing when he stopped. Of course, I couldn't see how much, but from the distance I was it looked like he was right on the crossing.

Page 45.

"Q. You say you were watching this flagman?

"A. I was, yes, sir.

"Q. Are you sure Mr. Cockraft stopped immediately when that flag was raised?

"A. Yes, sir, because I had to stop behind him and I was going to take care of myself and I was watching his car."

The next witness is H. H. Lee, page 53:

"Q. You were in Market street?

"A. Yes, sir.

"Q. Coming toward the crossing?

"A. Yes, sir, going to town.

"Q. Traveling in the same direction Mr. Cockraft was traveling?

"A. Yes, sir.

"Q. Did you see the flagman of the V. S. & P. Railroad at that time?

"A. Yes, sir.

Page 54.

"Q. Did you see that flagman before this accident occurred?

"A. Yes, for some time. When I drove down—it all happened just about the same time, you know, about the time I see the flagman this car was going in and the train coming in there and all about the same time, and a fellow didn't have much time to see very much.

"Q. When you first saw the flagman did he have his stop sign up or down?

"A. Well, he had it up when I first saw it. When the signal was thrown up the

train was heading into him, that is all I know about. it.

Page 55.

"Q. You were behind the car of Mr. Cockraft's?

"A. Yes, sir.

"Q. Any car between you and the first car or were you behind him?

"A. I think there was another car, the best I can remember; .there was another car to the left of me. I didn't pay it much attention.

"Q. But you were immediately behind Mr. Cockraft's?.

"A. Yes, sir.

"Q. Any car between you and the first car or were you behind him?

"A. I think there was another car, the best ·I can remember; there was another to the ·left of me. I didn't pay it much attention.

"Q. But you were immediately behind Mr. Cockraft's?

"A. Yes, sir.

"Q. Wasn't any car between you and Mr. Cockraft?

"A. No, sir, not between me and him."

The next witness is P. E. Palmerton, page 56:.

"Q. Where were you when the accident occurred?

"A. ·Going down Market toward Lake.

"Q. Going down Market toward Lake?

"A. Yes, sir.

"Q. How far were you from the crossing itself?

"A. I was about fifty or sixty feet this side of the railroad toward Crockett street.

Page 62.

"Q. Did he have his flag in his hand?

"A. He had the signal in his hand. · I couldn't tell whether it was a flag or one of these card signals.

"Q. You saw the signal?

"A. Yes, sir.

"Q. Where· was this car of Mr. Cockraft's when you saw this?·

"A. Coming down the side of that old brick building.

"Q. How close was he to the track at that · time?

"A. Well, he was very close.

"Q. How far away?

"A. I couldn't tell you just the distance, things move too quickly in a thing like that; ·I thought everything was safe; I didn't think· the engine was going to hit

him. If I was driving a car I would have driven it out from this side even.

"Q. He was away—some distance away from the tracks?

"A. He was a small distance, I couldn't even tell you how far.

"Q. Well, along about that distance?"

As against this testimony of the plaintiff the defendant ·introduced the testimony of O. Jennings, pages 74-75:

"Q. You have been the ᴠsignal man there for six years?

"A. More than six years.

"Q. Do you recall an accident that took place there on the 25th day of September last year?

"A. Yes, sir.

Page 78.

"Q. Did you see this car approaching?

"A. Yes, sir.

·"Q. How far away was it from the tracks?

"A. The car when I first saw it? .

"Q. Yes. ·

"A. I saw the car when it came out of Lake street coming down toward town, down Market. He come out of Lake. into Market street almost at the same time No. 1 blew for the Cotton Belt crossing.

"Q. When you raised the signal how far was he away from the tracks?

"A. Why, I couldn't say exactly how far he was away but he must have been, when I raised the signal, he must have been two hundred and fifty feet, something like that.

"Q. Away from the track, coming towards the track?

"A. Yes, sir.

"Q. What did he do—what did you do when you saw him coming beside that, did you watch him?

"A. Yes, I kept on watching him to see if he was ever going to stop or not. ᴠ

"Q. How fast was his car coming?

"A. It was running very slow.

"Q. Did you have the signal up at that time?

"A. Yes, sir.

"Q. How far away was the train?

"A. The ·train, as he came on down, the train, of course, it come on up, and then just about the viaduct, Spring street viaduct, when he was down, I suppose he was then seventy-five feet from the track.

"Q. Did you have your signal up?·

"A. Yes, sir.

"Q. Now, when did you realize he was not going to stop?

"A. I realized that about the time after he got right down to the track, I realized then that he wasn't going to stop.

"Q. What did you do then?

"A. I turned my attention to the engineer to stop him.

"Q. How far was the engineer away then?

"A. I couldn't say, I haven't measured it. They have got the distance there. When I got his attention I suppose he was seventy-five feet possibly.

"Q. What signal did you give the engineer?

"A. I threw the sign on him for him to stop.

"Q. What did he do?

"A. He stopped as quick as he could. He applied the emergency, of course.

"Q. What else, what about the bell?

"A. It was ringing; they have these automatic bell ringers on them, you know.

Page 80.

"Q. You know the bell was ringing?

"A. Yes, sir, it was ringing.

"Q. Did you at any time signal this gentleman to come on?

"A. No, sir, couldn't have afforded to do that, Mr. Randolph, right in the jaws of death.

"Q. Was there anything else you could have done to stop him that you neglected to do?

"A. No, sir, there was nothing in the world that I know of that I could have done besides what I did do.

"Q. As you looked at him coming down that street toward the tracks what did he seem to be doing?

"A. He seemed to be working with his car in some way.

"Q. Which way was he looking?

"A. He was looking down at his gear."

W. F. Graydoff, page 93:

"Q. Where were you standing when it occurred?

"A. Right here, by this telephone pole.

"Q. How long had you been standing there before this accident occurred?

"A. As I came down the steps I heard No. 1 blow, that is the passenger train.

Page 95.

"Q. Did you see the automobile before it got to the track?

"A. Yes, sir.

"Q. What was the automobile driver doing?

"A. Evidently he had started to put on his brakes, because he turned slightly as he got to the edge of the track and the front part of his car caught over the—got over the track and was in the middle of the track when the engine struck it.

"Q. What time did he come in your view?

"A. He was in my view from the middle of the block when I was first attracted to the fact that something was coming down the street.

"Q. Did he get to the track before you called him to stop him?

"A. I whistled to him and waved my hand to him.

"Q. What was Jennings doing?

"A. Jennings was in the middle of the street trying to stop him.

"Q. How far was the man away when this was all going on?

"A. He was probably 200 feet.

"Q. Did he pay any attention to any of these signals?

"A. I should think not, he didn't try to stop.

"Q. Did he stop at all until he got on the first rail?

"A. No.

Page 96.

"Q. When did you realize that this man was paying no attention to Jenning's signals?

"A. Well, when he made no particular effort to stop.

"Q. Then you tried your best to stop him, too, didn't you?

"A. Yes, sir."

George Collier, page 99.

"Q. Where were you just before the accident happened?

"A. I was just west of Market street crossing, right near the V. S. & P. Railroad office. I suppose I was twenty or twenty-five feet from the crossing, I mean from the sidewalk.

"Q. Did you see the accident?

"A. Yes, sir.

"Q. What did you see before the accident occurred, describe it?

"A. I was on my way from my little place of business where I make my reports out that we use for an office and I was on my way over to the railroad office to deliver my reports, as I got off at three o'clock—I work from seven to three

—and I saw No. 1 passenger train coming and I judge it was just the engine passed, under the viaduct ——

"Q. (Interrupting) Spring street viaduct?

"A. The Spring street viaduct, and I looked to see if everything was in the clear like a man will do, you know, and I saw an automobile driving down the incline on Market street, driving along slowly.

"Q. Coming from where?

"A. It was coming north, I guess you will say, if Market street runs north and south, and he was coming toward town and he was coming along there slowly. I thought possibly he would stop, so I stopped myself; I saw that they were both coming pretty close together, and I looked to see if I could see the crossing flagman and I saw that ——

"Q. (Interrupting) Where was he?

"A. He was standing out in the middle of the street.

"Q. What was he doing?

"A. He had the stop board, what we call the signal board, says 'stop' on it, kind of a round sign.

"Q. How did he have it?

"A. He had it up like this. (Witness demonstrating by holding sign up about his shoulder.)

"Q. When you first saw this automobile, how far was it from the rails?

"A. I suppose it was as far as from here to the back of this wall here.

"Q. At that time did you see Jennings, too?

"A. Yes.

"Q. What was he doing?

"A. He was standing with his board up.

"Q. Then this man that was in the automobile, did he seem to be paying any attention?

Page 101.

"A. Did he seem to be—I never did see him look up. I never noticed that particularly.

"Q. From where you were standing could you see the approaching train?

"A. Yes, surely.

"Q. From where this man approached the train, if he had looked to the right toward Red River bridge down the track, was there anything there to prevent him from seeing it?

"A. Well, there was when I first saw him. After he passed that brick wall he could have seen it then.

"Q. Did he look in that direction at all?

"A. I never noticed him look that way until his car stopped, then he started ——

"Q. Did you hear the engine coming as well as see it?

"A. Yes, sir, I heard the engine coming.

"Q. Did you hear the bell ringing?

"A. Yes, sir."

W. M. Lewis, page 112:

"Q. Did you see the accident?

"A. Yes, sir.

"Q. Where were you at the time?

"A. Well, Mr. Martin and Mr. House and myself were standing by the yard office I suppose about fifty feet from where it happened.

Page 114.

"Q. The yard office is on what side of Market street?

"A. On the right hand side going out of town.

"Q. I say about what time did you see an automobile approaching—what did you see in Market street, what did you see?

"A. This automobile was approaching the track and Mr. Jennings flagged him as is usual and customary about the usual place from the shanty in which he stays, and to the best of my knowledge, when I notice it the car was something like a hundred feet from the crossing, approaching the crossing, and he flagged him, and it seemed like he didn't either pay any attention or he didn't see it, or something happened; anyway he didn't stop, and when he gets down on the track Mr. Jennings was flagging this train and he seen he was not going to stop and he flagged the engineer of the train which was coming in, I suppose, between four and six miles per hour, and he seen it was not going to stop and he flagged the train and, of course, it was too late and it hit the automobile.

"Q. How far, when you first noticed this automobile, how far was it south of the tracks?

"A. It was something between, a rough estimate, of about a hundred feet, I suppose.

"Q. Coming down toward the track?

"A. Yes, sir.

Page 115.

"Q. What did you do?

"A. Mr. Riney and myself taken him and laid him outside on the ground.

Page 116.

"Q. Did he make any statement about it and if so what did he say?

"A. He said that he thought Mr. Jennings was flagging for a switch engine that was playing on a switch track for the Lee Hardware instead of this track on which the passenger train was approaching. This switch engine was switching on the west side and this passenger train was coming in on the east side."

R. L. Martin, page 122:

"Q. On the afternoon of September 25 did you see an accident at that crossing?

"A. Yes, sir.

"Q. Where were you?

"A. At the end of the yard office gallery.

"Q. What was the first thing that attracted your attention?

"A. Mr. Jennings.

"Q. What was he doing?

"A. He had his ——

"Q. Flag up?

"A. Yes, sir.

"Q. This it?

"A. Yes, sir, that's it.

"Q. Did you look up Market street toward the south?

"A. Yes, sir.

"Q. What did you see on the street?

"A. Saw Mr. Cockraft coming in his car.

"Q. About how far away was he from the track at that time?

"A. Up somewhere about fifty feet, may be a little more."

In weighing this evidence it is to be remembered that two of plaintiff's witnesses judged as to the distance it was from the plaintiff to the railroad track while sitting in an automobile in the rear of plaintiff and the other was in front of him fifty or sixty feet on the north side of the railroad tracks and on the opposite side of Market street from where the accident occurred, while defendant's witnesses, W. F. Graydoff, was standing at the side a little south and east of the point where the accident occurred, and Mr. W. M. Lewis and Mr. R. L. Martin were standing at the side, a little to the north and west of where the accident occurred, and they were in a better position to correctly see and judge the locus in quo than were the plaintiff's witnesses.

From all the evidence in the case we have reached the conclusion that the flagman, O. Jennings, was at his post of duty at the time of the accident and that he did everything in his power to prevent it.

In any event we are convinced that the plaintiff's evidence does not discharge the burden resting on him to prove that the accident was caused by the fault of the defendant.

Having reached this conclusion, it is not necessary for us to pass upon the question as to whether or not the plaintiff was guilty of contributory negligence.

The judgment appealed from is therefore affirmed.